725 A.2d 579

**OWENS–CORNING, et al.**

v.

**Vernon WALATKA, et al.**

**No. 385, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Feb. 25, 1999.

Reconsideration Denied April 5, 1999.

314

Thomas G. Hungar (Mark A. Perry, Larry L. Simms, Wesley L. Hsu, Gibson, Dunn & Crutcher LLP, Washington, DC, John Parker Sweeney, Gregory L. Lockwood and Miles & Stockbridge), Baltimore, on the brief, for appellant, Owens Corning.

Gerry H. Tostanoski (Scott Patrick Burns and Tydings & Rosenberg LLP, Baltimore, on the brief) for appellant, Owens–Illinois, Inc.

Harry Goldman, Jr. (Neal S. Wadler and Goldman, Skeen & Wadler, P.A., on the brief), Baltimore, for appellees.

Edward F. Houff, R. Thomas Radcliffe, Jr., Laura A. Cellucci and Church & Houff, P.A., Baltimore, amicus curiae.

Thomas V. Monohan, Jr. and Goodell, DeVries, Leech & Gray, LLP, Baltimore, for amicus curiae, Maryland Defense Counsel.

Argued before MOYLAN, ADKINS and THEODORE G. BLOOM (Retired, Specially Assigned), JJ.

ADKINS, Judge.

This appeal involves two of six asbestos-related cases that were consolidated for trial before the Circuit Court for Baltimore City. At issue are the claims of Marian Walatka, surviving widow and personal representative of her deceased

husband, Vernon Walatka, Sr., and the claims of Myrtle Adams, surviving widow of Bill Adams, and his co-personal representatives alleging injuries and death resulting from exposure to asbestos.[1] Mr. Walatka contracted the disease of mesothelioma (a type of cancer) from his exposure to asbestos and died at the age of seventy-four. Mr. Adams developed lung cancer after exposure to asbestos and died in 1995 at the age of seventy-three. Following a trial,[2] the jury rendered its verdict awarding damages to Mrs. Walatka for $703,500 for personal injury in the survival action, $250,000 for loss of consortium, and $1,500,000 for wrongful death. In the Adams action, the jury rendered a verdict of $50,000 for wrongful death, $50,000 for loss of consortium, and $203,500 for personal injury in the survival action.

With respect to the Walatka verdicts, appellants,[3] Owens Corning (OC) and Owens–Illinois, Inc. (OII), filed motions requesting application of the statutory cap on noneconomic damages set forth in Maryland Code (1974, 1995 Rep.Vol., 1997 Supp.), § 11–108 of the Courts & Judicial Proceedings Article (hereinafter "statutory cap" or "cap"). No party requested that the jury make any factual determinations relative to the statutory cap, and the trial court ruled on the motions. Pursuant to the cap, the trial court reduced the wrongful death award in the Walatka action to $515,000, but declined to reduce the personal injury and loss of consortium verdicts. The trial court ruled that appellants had the burden to establish that appellees' causes of action arose after the effective

---

1. We shall use the term "appellees" to include some or all of the following persons: Mrs. Walatka, the personal representative of Mr. Walatka's estate, Myrtle Adams, and the co-personal representatives of Mr. Adams's estate.

2. The jury decided issues of medical causation, product identification, and compensatory damages. All other liability issues were previously determined in a consolidated format and none of those findings is at issue in this appeal. See Adams v. Owens–Illinois, Inc., 119 Md.App. 395, 705 A.2d 58, cert. denied, 348 Md. 332, 703 A.2d 1264 (1998).

3. Appellants are Owens Corning and Owens–Illinois, Inc. We shall at times refer to both as joint appellants.

date of the statutory cap. It found that there was no evidence introduced regarding the date on which the plaintiff acquired mesothelioma and, in the absence of such proof, held that the statutory cap was not applicable except to appellees' actions for wrongful death, which did not arise until after the effective date of the statutory cap.

After the trial court issued its decision regarding application of the statutory cap, OC sought to satisfy the burden of proof imposed upon it by the trial court by taking the deposition of Dr. Andrew Churg. OC submitted Dr. Churg's deposition transcript and a proffer of his expected testimony that "Mr. Walatka's mesothelioma tumor developed no earlier than April, 1990." At a hearing on November 4, 1997, the trial court expressed displeasure with the form of this proffer. After OC filed its notice of appeal on November 4, it filed a further proffer that Dr. Churg would testify that "at an outer limit, a mesothelioma tumor is present for five years before diagnosis." On November 17, 1997, the trial court ordered that Dr. Churg's deposition could not be used as a proffer.

## ISSUES ON APPEAL

The parties raise and comprehensively brief a number of issues regarding application of Maryland's statutory cap in latent disease cases; in particular, the statutory language providing that the statutory cap shall apply "[i]n any action . . . in which the cause of action arises on or after July 1, 1986. . . ." CJ § 11–108(b). Some of these arguments revolve around the methodology for determining the date on which "a cause of action arises," e.g., whether the date should be determined by when the injured person first inhaled asbestos, when the disease came into existence according to the opinion of a qualified expert, or when the injured person first experienced clinical symptoms of the disease. These same arguments were addressed in a very recent published decision of this Court, and for that reason, will not be addressed in this opinion. *See Owens Corning v. Bauman*, 125 Md.App. 454, 726 A.2d 745 (1999) (holding that in a suit by a plaintiff who has suffered the disease of mesothelioma, the cause of action

arose for purposes of application of the statutory cap when the disease came into existence, and the disease came into existence when, based on expert testimony, the carcinogen caused cellular changes which led to an irreversible, fatal, or disabling disease rather than the point in time when the plaintiff inhaled the asbestos, or when the plaintiff was diagnosed or manifested symptoms of such disease).

The issues relating to the statutory cap that were not decided in *Bauman* and must be decided here are: 1) whether the burden of showing if the statutory cap applies rests with the plaintiff or the defendant; 2) what is the proper application of that burden under the circumstances of this case; and 3) whether the statutory cap violates the separation of powers clause in the Maryland Declaration of Rights.

The only other issue raised in this appeal is OC's contention that the plaintiffs in the Adams case failed to prove that an Owens Corning product was a substantial contributing cause of the asbestos-related disease suffered by Adams and his eventual death. In this regard, contrary to the contention of the Adams appellees, we hold that OC's appeal was timely filed.

## FACTS RELATING TO WALATKA APPEAL— MEDICAL EXPERT TESTIMONY

Three medical witnesses testified in the Walatka case on behalf of appellees—Dr. Samuel Hammar, a pathologist who reviewed pathology materials from Mr. Walatka, Dr. Sheldon Gottlieb, a treating physician who specializes in internal medicine, cardiovascular disease, and geriatric medicine, and Dr. Arnold Brody, a lung pathologist who did not review any of Mr. Walatka's pathology materials and did not testify specifically about Mr. Walatka. Appellants called no medical witnesses.

### Dr. Samuel Hammar

Dr. Hammar received tissue obtained from Mr. Walatka's 1995 biopsy and performed tests on that tissue. In his

opinion, the results confirmed a diagnosis of mesothelioma. He also opined that Mr. Walatka's mesothelioma was attributable to his exposure to asbestos. When Dr. Hammar was asked on cross-examination whether he could say within a reasonable degree of medical certainty how long before June of 1995 Mr. Walatka had mesothelioma, he replied:

There has only actually been one study that had looked at how fast mesotheliomas grow and how—what their doubling time is, and that study might not even be reliable,.... [Mesothelioma] is the type of tumor that might not be known for a long time until we get some better methods, because it doesn't grow as a spherical mass, it grows as a rind, and it is very hard to see the change in size over time which is necessary to calculate how fast a tumor grows.

### Dr. Sheldon Gottlieb

Dr. Gottlieb originally saw Mr. Walatka in 1989, in connection with cardiac problems. After Mr. Walatka underwent bypass surgery, Dr. Gottlieb followed his condition, seeing him every three to six months. Dr. Gottlieb testified that, in June 1995, Mr. Walatka "presented for a routine visit and there was some fluid on physical examination." This fluid was removed, and when Walatka returned for a visit later in June, Gottlieb found that "he was more short of breath. He was having trouble getting around because of shortness of breath." He also lost weight since his earlier June visit. Mr. Walatka consulted a lung specialist, and Dr. Gottlieb learned "that he had a kind of cancer called mesothelioma." Gottlieb continued to see Mr. Walatka during the course of the mesothelioma.

### Dr. Arnold Brody

Dr. Brody, who is a pathologist (not a medical doctor) testified generally about mesothelioma and its development. He explained that long before a patient has mesothelioma, there is cell division in the person's lungs. The cell division occurs as part of the body's normal process of replacing lung cells. Without any injury to the lung, the cells should divide at the rate of one out of one hundred cells, which he character-

izes as a "very low rate of cell division." When there is lung injury, which can be caused by asbestos or other factors, there will be an increased rate of cell division. Cancer is only formed, however, according to Brody, when the genetic structure of the cells change, and the cells lose control of their growth. With cancer, Brody said, "you injure the genes that control cell growth." Asbestos exposure, he said, can cause gene mutation. He further explained that, "I don't know the genes, precisely, in mesothelioma and lung cancer that will be mutated, but we know some of the ways, at least one or two of the ways that asbestos can cause these mutations." He went on to explain that the purpose of cell division is to create two cells from one. In order to create the new cell, all of the genetic material (chromosomes) that is contained in the nucleus of each cell must be duplicated.

Sometimes, where the lungs have been exposed to asbestos, as the cells divide and half of the chromosomes go to the new cell, "some of the chromosomal material has attached to the asbestos fibers and is not moving to its normal position." This abnormal chromosomal separation is known as aneuploidy. The "body defense mechanisms are very good at removing cells that are aneuploid, . . . but the person who gets a cancer has not removed all of those cells." "Sometimes it takes 40 years after an exposure for an individual to come to the clinic with a cancer. That is because it has taken all of these years for that cell with those errors to finally grow out into a tumor."

He explained that a person has mesothelioma when mesothelial cells located on the outside covering of the lung become cancer cells. He did not testify to any range of time period within which mesothelioma would develop or a tumor grow. Nor did he explain when or how the process of cell division in the lungs can be considered an irreversible step in the development of mesothelioma.

The facts relating to the Adams case will be set forth separately as we discuss that case in Section IV.

**DISCUSSION**

### I. Statute of Limitations

Appellants urge us to adopt a rule under which the statutory cap will be presumed to apply, unless the plaintiff proves that his cause of action arose prior to July 1, 1986 ("the effective date"). Appellees urge that we apply the opposite rule, under which the statutory cap will only apply if the defendant proves that the cause of action arose subsequent to the effective date. The arguments of appellants rest upon the language and purpose of the statutory cap, the public policy underlying its enactment, and common law principles regarding allocations of burdens of proof generally. Appellees also rely on the common law, specifically the burden imposed on the proponent of a motion, as well as cases in which the defendant sought to mitigate or reduce the plaintiff's damages.

We have not found any decision of the Court of Appeals or of this Court that has previously addressed this particular issue. After carefully examining the arguments advanced by each side, we conclude, for the reasons set forth below, that the burden of proof to show that the statutory cap is not applicable rests with the plaintiff.

In addition to arguments about which rule should be adopted, each party has concerns about the fairness of applying a rule adverse to its position under the particular circumstances of this case. For the reasons discussed below, we conclude that the general rule imposing the burden on the plaintiff should be applied in this case against appellees.

### A. THE BURDEN TO ESTABLISH THAT THE STATUTORY CAP DOES NOT APPLY FALLS UPON THE PLAINTIFF

#### The Statute and Public Policy

We begin with the text of the statute itself, as we attempt to discern the legislative intent regarding who shall bear the burden of proof to establish the applicability of the statutory cap. *See Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d

423 (1995) ("The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature."). The statutory cap enunciates that "[i]n any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000." [4] CJ § 11–108(b). The cap is broadly applied with a single limitation amount covering both the direct victim of tortious conduct and also all persons who claim injury through that victim. *See* CJ § 11–108(b)(3)(i). The cap is less restrictive in a wrongful death action in which there are two or more claimants, although even in that instance an award may not exceed one hundred and fifty percent of the usual cap. *See* CJ § 11–108(b)(3)(ii). The statute directs that in a "jury trial, the jury may not be informed of the limitation" and mandates that if the verdict exceeds the limitation, "the court *shall* reduce the amount to conform to the limitation." CJ § 11–108(d)(2) (emphasis added). The statutory directive to the court to apply the cap is mandatory, and there is no suggestion that a defendant is required to make a motion to trigger court action in this regard.

The major point that we glean from our review of the statutory language is that the legislature has made a strong policy statement placing limits upon the recovery of noneconomic damages in personal injury actions. Although in some instances the legislature resolves the evidentiary burden on a particular issue, *see, e.g.*, Md.Code (1975, 1997 Repl.Vol.), § 1–201(8) of the Commercial Law Article; Md.Code (1957, 1996 Repl.Vol.), § 298 of Article 27; Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 400, at 150 (2d ed. 1993), we find no explicit language in this statute addressing the evidentiary burden to prove whether a particular cause of action is subject to the statutory cap.

---

4. The statute establishes higher limits for actions in which the cause of action arises on or after October 1, 1994, ($500,000), and provides for an increase in the maximum amount of noneconomic damages of $15,000 on October 1 of each year beginning October 1, 1995. *See* CJ § 11–108(b)(2).

324

## Common Law Regarding Burden of Proof

When the legislature has not spoken regarding the burden of proof, judicial decision as to the burden is required. Judicial allocation of the burden will often rest on the policy enunciated in the statute. *See* Murphy, *supra*, § 400, at 150. According to Lynn McLain, *Maryland Evidence* § 300.1, at 134 (1987), "[I]f for public policy reasons certain claims or defenses are favored or disfavored, the parties will be allocated the burdens of proof and given lighter or heavier burdens accordingly." (Citations omitted); *accord McCormick on Evidence*, § 343, at 454 (J. Strong, ed. 4th ed. 1992); *see also* 9 Wigmore, *Evidence* § 2486, at 291 (1981) ("It is merely a question of policy and fairness....").

The Court of Appeals has examined the statute and its legislative history and determined that "[s]ection 11–108 was enacted in response to a legislatively perceived crisis concerning the availability and cost of liability insurance in this State." *Murphy v. Edmonds*, 325 Md. 342, 368, 601 A.2d 102 (1992). According to the Court, the underlying objective of the General Assembly was "to assure the availability of sufficient liability insurance, at a reasonable cost, in order to cover claims for personal injuries to members of the public." *Id.* at 369, 601 A.2d 102. In examining the constitutionality of the statute, the Court found it "significant that the cap applies to all personal injury claimants equally rather than singling out one category of claimants." *Id.* at 370, 601 A.2d 102. These statements in *Murphy* suggest to us that the Court of Appeals contemplated that a broad application of the statute was appropriate in order to serve the legislative purpose.

Relying on the statute and the *Murphy* decision, appellants argue:

Allocation of the burden of proof to defendants on the issue of the cap statute's enforceability would, in effect, create a presumption that the cap statute is ordinarily *not* enforced, absent proof to the contrary. That result would fly directly in the face of the General Assembly's intent that

the cap be enforced broadly against all classes of personal injury plaintiffs.

We find this argument persuasive, and think that it is consonant with the common law principles concerning allocation of the burden of proof. We also agree with appellants' contention that when the legislature has established a policy, the courts should implement the policy to the fullest extent. Accordingly, when the legislature has adopted a public policy that noneconomic damage awards must be limited, we should not impose a burden of proof, not contained in the statute, that handicaps achievement of the result favored by the statute.

■ Other common law principals regarding the burden of proof also support placement of the burden upon the plaintiff. Before explaining these, we pause to review what is meant by the term "burden of proof." The broad concept of "burden of proof" consists of at least two component parts. One is the burden of production—the duty of going forward with the evidence in order to avoid the direction by the judge of an adverse judgment at the close of the evidence. The other is the burden of persuasion—the standard of proof by which a party must satisfy the fact-finder in order to win a verdict in that party's favor. *See* Murphy, *supra,* § 400, at 149; McLain, *supra,* § 300.1, at 132.[5]

■ The plaintiff bears the burden of proof in most civil actions to establish the facts supporting a cause of action and damages. *See* McLain, *supra,* § 300.1, at 134 ("[B]oth fairness and efficiency dictate that ... the plaintiff in a civil case must bear the burden of producing evidence to support [the plaintiff's] allegations before a defendant should be asked to defend."); Murphy, *supra,* § 416(A), at 179 ("[I]n a personal injury case arising out of an auto accident, the plaintiff has the burden of persuasion on the issue of the defendant's negligence and on the issue of the plaintiff's damages."); McCormick, *supra,* § 337, at 428 ("The burdens of pleading and

---

5. McLain also describes a third burden, that of pleading. *See* McLain, *supra,* § 300.1, at 132.

proof with regard to most facts have been and should be assigned to the plaintiff who generally seeks to change the present state of affairs and who therefore naturally should be expected to bear the risk of failure of proof or persuasion."). Imposition of the burden on the plaintiff is based on practicalities of proof and fairness. *See* McLain, *supra*, § 300.1, at 134. Maryland cases have often recognized a plaintiff's burden to prove a *prima facie* cause of action and damages. *See, e.g., Wood v. Abell,* 268 Md. 214, 233, 300 A.2d 665 (1973) (holding that plaintiffs have the burden to prove negligence and damages); *Jones v. Federal Paper Bd. Co., Inc.,* 252 Md. 475, 485, 250 A.2d 653 (1969) (holding in a negligence action that "plaintiffs had the burden of proving their damages beyond mere conjecture and speculation...."); *Brock Bridge Ltd. Partnership, Inc. v. Development Facilitators, Inc.,* 114 Md. App. 144, 157, 689 A.2d 622 (1997) (holding in an action for breach of contract that "the plaintiff bears the burden of adducing sufficient evidence from which the amount of damages can be determined....").

The burden of proving a fact is often placed upon the party who presumably has peculiar means of knowledge enabling him to prove its falsity, if it is false. *See Lake v. Callis,* 202 Md. 581, 587, 97 A.2d 316 (1953); *Singewald v. Singewald,* 165 Md. 136, 141, 166 A. 441 (1933); *see also* McLain, *supra*, § 300.1, at 134 n. 8; McCormick, *supra*, § 337, at 429–30. Because the applicability of the statutory cap turns upon when the injured party's disease came into existence, *see Bauman* at 468, 726 A.2d 745, the issue will be largely determined according to what expert testimony can be introduced, based on the applicable facts, to establish such date of onset. While both sides to a personal injury action have access to experts who can examine the medical records of an injured party, it is fair to say that the injured party and those claiming through him have better information about the history and development of his disease. *See Fitzgerald v. Wright,* 155 N.J.Super. 494, 382 A.2d 1162 (App.Div.1978) (allocating to plaintiff the burden of proving the extent of the injury so as to reach no-

fault threshold based on superior knowledge of the injured party, not statutory terminology).

In the first place, the plaintiffs have unique knowledge about the times and extent of the injured person's exposure to asbestos, and whether it occurred at more than one period during his life. These circumstances could be highly relevant to determine when the disease came into existence.[6] Second, the injured party is better positioned to know about his personal medical history, including past medical exams and tests, and any conditions, diseases, or symptoms experienced. All of these historical facts may shed light on what caused the current injury or condition. Yet, the defendant can only learn about these historical facts, many of which occurred years previously, through discovery, a procedure that depends upon disclosure by the injured person or those claiming through him. In light of the parties' relative levels of knowledge about the facts that will determine applicability of the statutory cap, it is both fair and practical to impose upon the plaintiff the burden of proof on this issue.

■ Further, if the defendant were to have the burden, it would be its obligation to prove the negative fact that the injured party did not have the disease prior to the effective date of the statutory cap. It is the normal rule that the party who asserts the affirmative of an issue bears the burden of proof. See *Singewald,* 165 Md. at 140, 166 A. 441; McLain, *supra,* § 300.1, at 134 n. 8 (citing 10 M.L.E. Evidence § 21, at 101 (1961), and *Chesapeake & Potomac Tel. Co. v. Hicks,* 25 Md.App. 503, 523, 337 A.2d 744, *cert. denied,* 275 Md. 750 (1975)).[7] To require a defendant to prove affirmatively that an injured person had not contracted the disease prior to the

---

6. For example, if the injured party was exposed to asbestos for a period of two years beginning in 1950, and again for a period of five years beginning in 1970, and the expert witness opined that his asbestos related disease took twenty years to develop from date of exposure, then knowledge of such exposure would be important to prove whether his disease came into existence in 1970–1972 or 1990–1992.

7. Repeated judicial recognition of this rule was acknowledged, and to some extent, criticized in McCormick, *supra,* § 337, at 429. McCor-

effective date would require it to prove a negative fact resting in large part within the knowledge of its opposing party. Such a burden would not be fair or consistent with either the statutory goals or common law principles.

Appellees argue that the burden should be placed upon defendants because those seeking reduction of compensatory damages bear the burden of going forward initially with some evidence. In support of their contention, appellees cite *Kruvant v. Dickerman,* 18 Md.App. 1, 305 A.2d 227 (1973), *Baublitz v. Henz,* 73 Md.App. 538, 535 A.2d 497 (1988), and *Blanchfield v. Dennis,* 292 Md. 319, 438 A.2d 1330 (1982).[8] We explain with respect to each case why it does not support appellees' contention.

*Kruvant* involved the burden of proof in establishing damages to a motor vehicle that was damaged but not destroyed.

---

mick asserts that the important consideration in cases involving proof of a negative is not which party has the negative, but which party has knowledge of the facts. *See id.* at 428–29 (citations omitted). This position has merit, and, were we to focus our inquiry from this viewpoint, our reference to the general rule could be viewed as an alternative articulation of our belief that the defendant should not be required to prove facts relating to plaintiff's past life experiences and state of health.

8. Appellees also cite "Lynn McClain [sic] Maryland Practice—Maryland Evidence, Line 5, Section 300.1, 321, (1987)," without specifying what text supports their position. We have examined all of section 300.1, titled "Introduction to Burdens of Proof," and find nothing that supports appellees' assertion. Appellees cite line five of that section, which simply states that "[t]his chapter will discuss separately each of these three specific burdens [of proof]...." We also reviewed page 321, which appellees cite, but find nothing pertinent to the issue on that page. Appellees' citation of Murphy, *supra,* is similarly baffling. The page cited, page 406, discusses the evidence law regarding statements of intent made by individuals. Section 406 addresses burdens of persuasions generally, and compares the preponderance standard with the clear and convincing standard. In explaining that jury instructions that define the burden should not be misleading, the author gives an example involving an automobile accident and mentions that the burden of persuasion to prove contributory negligence rests on the defendant. If this is where appellees place their reliance, it is misplaced. It is well established that contributory negligence is an affirmative defense. There is nothing in the statute or law that suggests that the statutory cap was intended as an affirmative defense.

*See Kruvant,* 18 Md.App. at 2, 305 A.2d 227. Previous case law had established the measure of damages as the reasonable cost of repairs, provided that the cost was less than the diminution value of the vehicle due to the injury. *See id.* at 2–3, 305 A.2d 227. The plaintiff proved the cost of repairs, but not the diminution in value, and the issue presented on appeal was whether the plaintiff also had the burden to prove that the cost of repairs did not exceed the diminution in value. We held that "when a plaintiff has established a prima facie case by proving his damage, according to one acceptable measure of damage, it becomes the obligation of the defendant to offer evidence that the damage would be less under a different acceptable measure of damage." *Id.* at 7, 305 A.2d 227. That principal is not applicable under the circumstances of this case because we are not presented with two acceptable measures of damages, both potentially applicable in every case. Here, the legislature has declared that the cap on damages is in the public interest and necessary in order to avert an impending insurance crisis. Given this legislative mandate and its purpose, application of the cap must logically be viewed as preferable to non-application. The legislature set a date for implementation of the new policy and determined applicability with respect to each case based on the date the plaintiff's cause of action arose. Given our interpretation in previous cases of when a cause of action arises, we must determine applicability based on the plaintiff's medical history, not measurement of damages. *See Bauman,* at 468, 726 A.2d 745. Accordingly, *Kruvant* is inapposite.

With respect to appellees' reliance on *Baublitz,* we agree with appellants that *Baublitz* "does not even discuss the allocation of a burden of proof, but instead stands only for the unremarkable proposition that a party is not entitled to a jury instruction in the absence of evidence sufficient to justify the instruction." In *Baublitz,* the defendant appealed from the trial court's refusal to instruct the jury that damages awarded for loss of future earnings must be reduced to present value. *See Baublitz,* 73 Md.App. at 549, 535 A.2d 497. We affirmed the trial court because there was no expert testimony or tables

introduced into evidence that would explain to the jury how to make the calculation to reduce future sums to present value. *See id.* at 549–50, 535 A.2d 497. It was our belief that the jury should not be asked to make a calculation that is beyond the understanding and capability of most lay persons without evidentiary information as to how to do so. *See id.* at 550, 535 A.2d 497. Considerations of how to allocate the burden of proof to show whether a statutory damage limitation should apply simply did not enter our decision. *See id.* at 549–50, 535 A.2d 497. For the same reason, the Court of Appeals decision made six years earlier, in *Blanchfield,* is not supportive of appellees' argument. In *Blanchfield,* the Court declined to address substantively a similar issue, simply saying, in a footnote, that "we mention, without comment as to its necessity, that respondent did not proffer any evidentiary basis, expert or otherwise, to underpin his requested present value instruction." *Blanchfield,* 292 Md. at 322 n. 3, 438 A.2d 1330.

Appellees also argue that appellants have the burden to show that the statutory cap applies because appellants made the motion to reduce damages awarded by the jury. They cite the following cases requiring the proponents of various types of motions to bear the burden of establishing that a motion should be granted: *Urquhart v. Simmons,* 339 Md. 1, 17–18, 660 A.2d 412 (1995) (motion to transfer action); *Butler v. State,* 335 Md. 238, 254, 643 A.2d 389 (1994) (motion to dismiss criminal case on ground of collateral estoppel); *Mejia v. State,* 328 Md. 522, 533, 616 A.2d 356 (1992) (challenge to jury selection); *Webb v. Joyce Real Estate, Inc.,* 108 Md.App. 512, 522, 672 A.2d 660 (1996) (motion for summary judgment); *Thomas v. Ramsburg,* 99 Md.App. 395, 400, 637 A.2d 863 (1994) (motion to dismiss for lack of prosecution); *Shunk v. Walker,* 87 Md.App. 389, 398, 589 A.2d 1303 (1991) (motion for modification of child custody); *Nationwide Mut. Ins. Co. v. Hart,* 73 Md.App. 406, 410, 534 A.2d 999 (1988) (motion for interlocutory relief). All of the motions in those cases differ from the appellants' motion in the instant case because none of them rests upon a mandatory legislative directive to the court that it "shall reduce the amount [of the verdict] to conform to

the limitation." CJ § 11–108(d)(2)(i). None rests upon legislation comparable to *that* presented here, pronouncing an absolute rule, based on public policy, that "[i]n any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed [the cap]." CJ § 11–108(b)(1). All of the matters raised in the motions cited by appellees can be waived if not raised by motion because the relief requested is relief that benefits *only* the individual litigant. The statutory cap, on the other hand, is not designed to relieve any individual litigant, but rather to avoid "a legislatively perceived crisis concerning the availability and cost of liability insurance in this State." *Murphy*, 325 Md. at 368, 601 A.2d 102. To be fully effective, enforcement of the statutory cap cannot depend upon the diligence and timeliness of any individual litigant in making a motion for enforcement. For this reason, we believe that the legislature intended that a court impose the statutory cap regardless of whether the defendant requested that it do so. Accordingly, any motion made by a defendant to bring to the court's attention its obligation to enforce the cap must be viewed in a category different from the types of motions cited by appellees that seek relief only for the benefit of the litigant and therefore are waivable.

## B. APPELLEES DID NOT MEET THEIR BURDEN

Appellees argue that, regardless of how we allocate the burden of proof generally, the statutory cap should not apply in this case because the law existing at the time the verdict was rendered was that the "cap did not apply to latent disease asbestos cases," citing *Owens–Illinois, Inc. v. Armstrong*, 326 Md. 107, 604 A.2d 47 (1992) ("*Armstrong II* "). Based on this premise, appellee Walatka seems to make two claims. First, appellee argues that the rule of *Anchor Packing Co. v. Grimshaw*, 115 Md.App. 134, 692 A.2d 5 (1997), *vacated on other grounds sub nom. Porter Hayden Co. v. Bullinger*, 350 Md. 452, 713 A.2d 962 (1998), which was decided after the verdict in this case, should be applied only prospectively. Second, appellee contends that because neither party introduced evi-

dence of when Mr. Walatka's disease came into existence, the issue regarding application of the cap has not been preserved for appellate review. Appellee's premise, and the two arguments flowing therefrom, are without merit.

Appellees have misinterpreted *Armstrong II*. The plaintiff in *Armstrong II* was diagnosed with the disease of asbestosis in May 1987, during a medical examination. *See Armstrong II*, 326 Md. at 123, 604 A.2d 47. He had been exposed to large amounts of asbestos from 1942 to 1963. *See id.* at 111, 604 A.2d 47. The Court of Appeals quoted the testimony of the expert witness for Owens–Illinois explaining that

> asbestosis does not develop immediately after exposure. It takes many, many years, and usually the kind of latency period that we are talking about is probably at the minimum 15 years but more ordinarily 20 or more years. During unusual circumstances less than that could cause the disease.

*Id.* at 124, 604 A.2d 47. The Court concluded from this testimony that "it is reasonable to assume that Armstrong's asbestosis took approximately twenty years to develop." *Id.* The Court went on to apply a practical analysis regarding Mr. Armstrong's disease:

> Even assuming that the initial damage to Armstrong occurred in 1963, the last year in which he worked in the shipyards, the disease 'ordinarily' would have developed by 1983 and under 'unusual' circumstances even earlier. The only reasonable conclusion, even viewed in the light most favorable to Owens–Illinois, is that Armstrong had asbestosis prior to July 1, 1986.

*Id.* Thus, the Court relied on expert testimony *presented by the defendants,* and used it against them to reach its conclusion. Contrary to appellees' assertion, the Court of Appeals did not set down a rule of law that the statutory cap does not apply to latent asbestos related diseases. Thus, our decision in *Grimshaw,* holding that the cap applied unless the disease came into existence prior to the effective date, was completely consistent with *Armstrong II*. Accordingly, there is no reason

to consider the issue of prospective or retrospective application of *Grimshaw.*

■ Appellees argue that the rule that applicability of the cap rests upon evidence regarding onset of the disease should not be applied here because neither party introduced expert testimony to establish the onset of Mr. Walatka's mesothelioma or requested a jury instruction or special verdict by the jury, and therefore the issue is not preserved for appellate review. This argument begs the question. Appellee's argument depends upon two erroneous *assumptions:* first, that the burden of proof rests with appellants; and second, that the issue must be decided by the jury. We have already said that the burden to produce evidence that is probative with respect to when the plaintiff's disease came into existence rests with the plaintiff. Given allocation of this burden, appellees' concession that they introduced no evidence on this issue merely reinforces our conclusion, based upon a review of the record, that appellees failed to meet this burden. We discuss the evidence below. Second, like most factual issues, the factual issues involved in this determination may be decided by the jury, but if the court fails to submit an issue to the jury, a party waives the right to a trial by jury on that issue unless it demands submission prior to the time the jury retires. *See* Md.Rule 2–522; *Bauman,* at 518, 726 A.2d 745.

■ Notwithstanding appellees' concession that there was no evidence regarding the time of onset of Mr. Walatka's disease, appellee nonetheless suggests that the testimony of Dr. Brody, a microbiologist, was sufficient to establish that Mr. Walatka's mesothelioma was in existence prior to the effective date. We do not agree. Mr. Walatka suffered from mesothelioma and the disease was diagnosed in 1995, nine years after the effective date of the statutory cap. Dr. Brody expressed no opinion on how long mesothelioma takes to develop, *i.e.* the length of the period from the point when cancer cells form and the mesothelioma becomes irreversible, until the point when the cancer is clinically identified. Dr.

Brody only stated that "[s]ometimes it takes 40 years after an exposure for an individual to come to the clinic with a cancer." This statement may reflect a high-end example of the time period between asbestos exposure and the appearance of clinical symptoms. It is very clear, however, that the time period between exposure and clinical symptoms is not the appropriate test. In an asbestos-related injury case, harm occurs and the cause of action arises when cellular changes develop into a disease. *See Grimshaw,* 115 Md.App. at 160, 692 A.2d 5 ("Mere exposure to asbestos and cellular changes resulting from asbestos exposure . . . alone is not a functional impairment or harm, and therefore, do not constitute a legally compensable injury."); [9] *Bauman,* at 468, 726 A.2d 745. With specific reference to mesothelioma, we have adopted the characterization that "[a] person diagnosed with mesothelioma has suffered a real and immediate injury which was inflicted when the cancer cells first began growing in his body." *Bauman,* at 479 n. 7, 726 A.2d 745. Dr. Brody's testimony was consistent with this rule of law because he agreed that cell division triggered by asbestos exposure does not necessarily result in mesothelioma or other cancer.

We conclude that there was no testimony that could support an inference that Mr. Walatka's mesothelioma came into existence prior to the effective date of the statutory cap.[10]

## II. The Statutory Cap is Constitutional

■ Appellees, like many plaintiffs before them, challenge the constitutionality of the statutory cap, advancing several

---

9. In *Grimshaw,* the plaintiffs' expert testified that "when asbestos fibers are inhaled they start causing cellular changes, but those cellular changes may not become mesothelioma, depending on the individual. Further, he stated that the cellular changes that occur before they become mesothelioma are not disease, according to Stedman's Medical Dictionary." *Grimshaw,* 115 Md.App. at 159, 692 A.2d 5.

10. In light of this conclusion, we need not address appellants' argument that Walatka's claim for loss of consortium arises later than the survival action.

arguments.[11] Although they recognize that the Court of Appeals in *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992), rejected a constitutional challenge to the statute, they insist that this appeal raises new arguments not previously considered by the Court of Appeals or this Court.

Appellees assert that the cap "interferes with the classical constitutional function of the Judicial Branch, through jury trial" and thereby violates the separation of powers doctrine found in Article 8 of the Maryland Declaration of Rights. Appellees rely on the case of *Best v. Taylor Machine Works*, 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057 (1997), in which the Illinois Supreme Court struck down a cap on noneconomic damages on the basis that reduction of excess jury awards was exclusively a function of the judiciary, and the cap statute was an unconstitutional "legislative remittitur." *Id.*, 228 Ill.Dec. 636, 689 N.E.2d at 1080. Appellants counter that the Court of Appeals in *Murphy* did implicitly consider and reject this argument, and explain why the argument is unsound. Although the plaintiffs in *Murphy* did not frame their constitutional arguments precisely in the language utilized by appellees here, we think that the substance of appellees' argument is closely related to that made in *Murphy*. Further, the Court's rationale for rejecting the plaintiffs' argument in *Murphy* encompasses our reason for rejecting appellees' theory that the cap statute is an unconstitutional "legislative remittitur."

One of the arguments made to the Court in *Murphy* was that the statutory cap infringes upon the right to a jury trial under Articles 5 and 23 of the Maryland Declaration of Rights. *See Murphy*, 325 Md. at 370, 601 A.2d 102. As the Court summarized the argument, "[T]he plaintiffs contend[ed] that the mandatory reduction to $350,000 of the jury's award for

---

11. Appellees raised the constitutionality of the statutory cap below, and although they did not file a cross-appeal, we will consider the allegedly new grounds raised. *See Health Servs. Cost Review Comm'n. v. Holy Cross Hosp., Inc.*, 290 Md. 508, 515, 431 A.2d 641 (1981); *Offutt v. Montgomery County Bd. of Educ.*, 285 Md. 557, 563, 404 A.2d 281 (1979).

noneconomic damages 'interferes with the jury's exclusive province in determining factual issues.' " *Id.* at 371, 601 A.2d 102. The Court first examined the history of a litigant's constitutional right to a jury trial, and explained that such right "is concerned with whether the court or the jury shall decide those issues which are to be resolved in a judicial proceeding." *Id.* It differentiated judicial interference with the right to a jury trial from legislative modification or abrogation of a common law right, explaining that when the latter occurs "no question concerning the right to a jury trial arises." *Id.* at 372, 601 A.2d 102.

In further explaining the relationship between a litigant's right to a jury trial and the legislature's power to make substantive law, the Court quoted from its 1929 decision in *Branch v. Indemnity Ins. Co.*, 156 Md. 482, 486, 144 A. 696 (1929), which held that "where the Legislature authorizes a jury trial to determine the facts with regard to liability, but the statute itself fixes the damages, there is no interference with the constitutional right to a jury trial." *Murphy*, 325 Md. at 372, 601 A.2d 102. The Court explained why, in enacting the statutory cap, the legislature did not infringe upon a right to jury trial:

> The General Assembly . . . did not attempt to transfer what is traditionally a jury function to the trial judge. Instead, the General Assembly abrogated any cause of action for noneconomic tort damages in excess of $350,000; it removed the issue from the judicial arena. No question exists concerning the role of the judge versus the jury with respect to noneconomic tort damages in excess of $350,000. Therefore, no question concerning the constitutional right to a jury trial is presented.

*Id.* at 373, 601 A.2d 102. The Court of Appeals also quoted the United States District Court for the District of Maryland in *Franklin v. Mazda Motor Corp.*, 704 F.Supp. 1325, 1331 (D.Md.1989): "The power of the legislature to define, augment, or even abolish complete causes of action must necessarily include the power to define by statute what damages may

be recovered by a litigant with a particular cause of action." *Murphy*, 325 Md. at 373, 601 A.2d 102.

Thus, the Court of Appeals made it clear that the legislative power to create, modify, and abolish causes of action did not interfere with a litigant's right to a jury trial or infringe upon the judiciary's control over court proceedings. We think that to accept appellees' contention that in enacting the statutory cap, the legislature usurped the judicial power to reduce excessive jury awards, would be a rejection of the Court of Appeals's reasoning in *Murphy*.

█ A trial court has the power to order a remittitur if it determines that the verdict awarded by the jury is " 'grossly excessive,' or 'shocks the conscience of the court,' or is 'inordinate' or 'outrageously excessive,' or even simply 'excessive.' " *Banegura v. Taylor*, 312 Md. 609, 624, 541 A.2d 969 (1988). Technically speaking, in ordering a remittitur, the trial court does not reduce the verdict. Rather, the court orders a new trial unless the plaintiff will agree to accept a lesser sum fixed by the court, instead of the jury verdict. *See id.* The Illinois Supreme Court in *Best* explained that "[a]s a check on excessive verdicts, . . . the inherent power of the court to order a remittitur . . . is essential to the judicial management of trials." *Best*, 228 Ill.Dec. 636, 689 N.E.2d at 1080.

Upon analysis of the Illinois court's opinion, we perceive that its rationale for holding its cap statute to be violative of its separation of powers doctrine rests on or is inextricably intertwined with protection of the right to a jury trial. In explaining why the statute constituted an impermissible "legislative remittitur," the Illinois court explained:

> Unlike the traditional remittitur power of the judiciary, . . . [the cap] *disregards the jury's careful deliberative process* in determining damages that will fairly compensate injured plaintiffs who have proven their causes of action. The cap on damages is mandatory and operates wholly apart from the specific circumstances of a particular plaintiff's noneconomic injuries. Therefore, [the cap] unduly encroaches upon the fundamentally judicial prerogative of determining

whether a jury's assessment of damages is excessive within
the meaning of the law.

*Id.* (emphasis added). That the court depended on the right
of jury trial as justification for its ruling was further evident
when it found "persuasive the discussion of legislative remitti-
tur contained in an opinion of the Supreme Court of Washing-
ton, *Sofie v. Fibreboard Corp.*, 112 Wash.2d 676 [636], 771 P.2d
711 (1989)." *Id.*, 228 Ill.Dec. 636, 689 N.E.2d at 1080. It
quoted the *Sofie* court's observation that the statute " 'directly
changes the outcome of a jury determination . . . by taking a
jury's finding of fact and altering it to conform to a predeter-
mined formula.' " *Id.* (quoting *Sofie*, 771 P.2d at 720). The
Illinois court declined to rest its holding expressly upon a
violation of the right to a jury trial. We perceive, however,
that its separation of powers rationale is so closely related to a
rationale based on protecting the right of jury trial, that its
holding and rationale are inconsistent with the decision of our
Court of Appeals in *Murphy* rejecting the denial of jury trial
argument.

The *Best* court's analysis is also inconsistent with *Murphy*
in another way. The Illinois court explained that "[a]lthough
legislative limits upon certain types of damages may be per-
mitted, such as damages recoverable in statutory causes of
action, we hold that the cap . . . violates the separation of
powers clause of the Illinois Constitution." *Id.*, 228 Ill.Dec.
636, 689 N.E.2d at 1081. We think this language conflicts
with the Court of Appeals's approval of Judge Niemeyer's
holding quoted above, that "[t]he power of the legislature to
define, augment, or even abolish complete causes of action
must necessarily include the power to define by statute what
damages may be recovered by a litigant with a particular
cause of action." *Murphy*, 325 Md. at 373, 601 A.2d 102
(quoting *Mazda Motor*, 704 F.Supp. at 1331).

Although not quoted by the *Murphy* Court, Judge Niemey-
er in *Mazda Motor* also expressly rejected the plaintiff's
contention that the statutory cap violated the separation of
powers doctrine contained in Article 8 of the Maryland Decla-
ration of Rights. In doing so, Judge Niemeyer reasoned:

The power of the legislature to abolish the common law necessarily includes the power to set reasonable limits on recoverable damages in causes of action the legislature chooses to recognize. The Court therefore agrees ... that if the legislature can, without violating separation of powers principles, establish statutes of limitations, establish statutes of repose, create presumptions, create new causes of action and abolish old ones, then it also can limit noneconomic damages without violating the separations of powers doctrine.

*Mazda Motor,* 704 F.Supp. at 1336. In our decision in *Edmonds v. Murphy,* 83 Md.App. 133, 573 A.2d 853 (1990), we expressly rejected a challenge to the statutory cap, relying upon the reasoning of Judge Niemeyer. *See id.* at 149–50, 573 A.2d 853. Although the separation of powers doctrine issue was not explicitly argued when that case reached the Court of Appeals, as we explained above, we think that the Court of Appeals implicitly rejected such an argument in the course of its ruling on the right to a jury trial argument that *was* explicitly raised.[12] If it did not, we do so, again, based on the reasoning of *Mazda Motor.*

### III. The Appeal By Owens Corning Was Timely

▮ The Adams case, the Walatka case, and several other cases were consolidated for trial. Walatka was designated as the lead case, the consolidated cases were assigned the consolidated case number 97027701, and a separate docket was established for that consolidated action. The court's consolidation order directed that "all pleadings, discovery and motions as to any case in this cluster be served on all parties to the cluster of cases...." It is the consolidated nature of these cases that underlies the parties' dispute as to whether OC's appeal from the Adams judgment was timely.

In a motion filed in this appeal, the Adams appellees argue that since OC's motion for judgment notwithstanding the

---

**12.** As appellants correctly point out, the Court noted our ruling on this point. *See Murphy,* 325 Md. at 351 & n. 4, 601 A.2d 102.

verdict (JNOV) under Maryland Rule 2-532 was denied by order of the circuit court on July 16, 1997, OC's notice of appeal, not filed until October 9, 1997, was untimely. OC, on the other hand, contends that the circuit court's denial of its motion for JNOV was not a final judgment because both the order for judgment in favor of the Adams appellees and the denial of OC's motion for JNOV were entered on the docket for the consolidated cases only (not the separate Adams case), and none of the consolidated cases was appealable until all claims at issue in that cluster had been resolved. The issues in the consolidated cases did not become final, OC contends, until the announcement of the final judgment in the Walatka case on October 9, 1997. This final judgment was entered in consolidated case number 97027701 on October 10, 1997.[13] We agree that OC's appeal was timely.

Maryland Rule 2-503(a)(2) provides that "[i]n the trial of a consolidated action, the court may direct that joint or separate verdicts or judgments be entered." Following judgment entered by the trial court, OC and Adams filed motions for JNOV in the Adams case. The trial court denied both motions and the orders were entered on the docket of the consolidated case. No separate order denying either motion was entered on the docket of the separate Adams case. Similarly, orders for post-trial motions relating to the Walatka case were also entered in docket entries for the consolidated case, but not on the docket for the separate Walatka case.

We think that the trial court intended that the judgments entered in the consolidated case be joint, and treated as a consolidated unit for purposes of appeal. If the trial court had intended to enter separate judgments within the meaning of Rule 2-503(a)(2), the court would have caused the judgment to be entered on the separate docket sheets for each of the separate cases. *Compare Yarema v. Exxon Corp.*, 305 Md.

---

13. Although OC's appeal was filed one day prior to the date the Walatka judgment was entered on the docket in 97027701, OC's notice of appeal, which was filed after the trial court's announcement of the Walatka judgment, is deemed to have been filed after entry of final judgment on October 10, 1997. *See* Md.Rule 8-602(d).

219, 239–40, 503 A.2d 239 (1986) (holding that it was clear that the trial court entered separate judgments when it entered separate orders denying post-judgment motions *on separate docket sheets for each of the separate cases* ). Accordingly, the thirty day period for filing the notice of appeal ran from the entry of the judgment resolving all claims and issues in the consolidated case, *i.e.* the final Walatka judgment on October 9, 1997. As we believe the appeal was timely, we now address the merits.

### IV. OC's Product was a Substantial Contributing Cause of the Asbestos Related Disease

Appellant OC argues that the appellees in Adams failed to present evidence sufficient to support a finding that OC's product was a "substantial contributing cause" of Mr. Adams's injuries within the standard established in *Eagle–Picher Industries, Inc. v. Balbos,* 326 Md. 179, 210, 604 A.2d 445 (1992). Appellees dispute this. We have closely examined the record, and agree with appellees that the evidence was sufficient to meet the *Balbos* standard.

The Court of Appeals applied the "substantial factor" test in the asbestos setting for cases involving bystanders who were not direct users of the hazardous product. *See id.* The Court explained that in such a case, the test is fact specific to each individual's case, requiring cognizance of the interrelationship between the use of the product in the workplace and the plaintiff's activities therein. *See id.* The Court stated:

> This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product.... 'In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease.'

*Id.* at 210–11, 604 A.2d 445 (citations omitted). This test is known as the "proximity, frequency, and regularity" test. *Grimshaw,* 115 Md.App. at 186, 692 A.2d 5. "As long as [the] plaintiff has presented some evidence to support his theory of liability, the trial court should submit the issue to the jury." *Id.* at 187 n. 11, 692 A.2d 5. The jury, as trier of fact, must then determine if the plaintiff has proven that the defendant is liable. *See Balbos,* 326 Md. at 208–09, 604 A.2d 445.

On appeal from denial of a motion for judgment we must view the evidence and the reasonable inferences there-from in the light most favorable to the appellee. *See Menish v. Polinger Co.,* 277 Md. 553, 567, 356 A.2d 233 (1976). If there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then we must affirm the jury's verdict on that issue. *See Houston v. Safeway Stores, Inc.,* 109 Md.App. 177, 182–83, 674 A.2d 87, *cert. granted,* 343 Md. 334, 681 A.2d 70 (1996), *rev'd on other grounds,* 346 Md. 503, 697 A.2d 851 (1997).

It is not sufficient that the product was used any-where and at any time in the workplace, regardless of whether the plaintiff was present. *See Balbos,* 326 Md. at 216–17, 604 A.2d 445 (rejecting the "fiber drift theory"). "A plaintiff must show more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use.... A plaintiff must present evidence 'to show that he inhaled asbestos fibers shed by the specific manufacturer's product.'" *Grimshaw,* 115 Md.App. at 186, 692 A.2d 5 (citations omitted).

## ADAMS FACTS

Mr. Bill Adams worked at Key Highway Shipyard beginning in 1952 and later as a carpenter at Sparrows Point Shipyard (Sparrows) until his retirement in 1983 or 1984. Several witnesses worked at the same location as Mr. Adams during his tenure there and their testimony was admitted at trial.

## Frank Disney Testimony

Frank Disney testified that he worked at Sparrows from 1940 until 1984, a period encompassing Adams's employment at Sparrows. Disney, a material chaser leader, was responsible for overseeing, delivering, and dispersing materials, including asbestos materials, throughout Sparrows. He stated that he "was in the shipyard, all through the shipyard at least once a day and almost every day." Disney also testified that whenever something was needed, he and his crew would have to transport it to the ship, "unload it," and "put it away." Although he did not remember doing this every day, it was a pretty common occurrence, and occurred "several times a month." Among other brands of asbestos pipecovering used on the ships, Disney recalled the Kaylo and Armstrong brands.

While on the ship, Disney would go into certain areas, including the engine room and the boiler room. He testified that "[w]elding, burning, pipefitting, machinist[s] would be in there working, pipecoverers would be in there working. Everybody would be in there working." When asked if all these people were working in the room at the same time, he responded, "Oh, yes, painters, too, laborers, [and] carpenters."

Disney testified that the carpenters "put up staging for various other crafts to work off of . . . like a stationary scaffold. . . ." Pipecoverers, working on these scaffolds, would "get the pipecovering out of the cartons" and if necessary "they would cut the pipecovering." This cutting would take place "[r]ight there" in the room. When the pipecovering was being cut, asbestos "[d]ust would be flying all over the place . . . like a man sawing a piece of wood, [and] the sawdust flying." The asbestos dust would "fall on anything . . . people and whatever is there." Disney described the appearance of one's clothing after being in a room where pipecoverers were working as "like somebody threw a bag of flour on you. . . ." When asked if one would breathe the dust in, Disney testified, "If you want to breathe, you breathe it, yes. You never had [any] protection."

Disney testified that asbestos "block material" was also used by insulators and when it was used "dust would fly off of it." He explained that pipecovering or block insulation was used on the ship "wherever [there was] a steam line." He remembered seeing the Kaylo product in "the engine rooms." He recalled seeing "Armstrong and Owens" products the most often. He also recalled that Owens manufactured the Kaylo Product.

Disney testified that he remembered seeing Bill Adams when he would visit the engine room or the boiler room, and that he would see "Bill quite often." He stated that he did not specifically notice if he saw Adams on a ship when a Kaylo product was being used; however, he would see the Kaylo product "every time" he went to the engine or boiler rooms and the pipecoverers were working. He did see Adams in an engine room when a pipecoverer was working.

### Harold Adams Testimony

Harold Adams, Bill Adams's son, testified that he began working at Sparrows in 1967. He testified that when he would see his father at lunch, "[h]is clothing would be dusty and have like white stuff all over it...." This dust was "all over his clothes ... [a]nd when he took his hat off, he would have it in his hair." He testified he was in the engine or boiler room every day and would see his father "every day on the ship" in the engine or boiler room. When asked to describe the conditions of the engine room when he would see his father working, he responded:

> Well, the conditions, it would be very bad, because sometimes you couldn't even see from one side to the other side of the room ... [b]ecause of the dust and the way the dust was in the engine room, ... it would look like it [was] full of smoke ... but it would be dust, ... from all of the people working in the same area.... [T]here would be a lot of people ... covering pipes ... and the carpenters, they would be in there and they would be building staging.... [Mr. Adams] would be in there putting the scaffolding up or else taking it down and changing it from one area to another

area. Like on one area they might be working on a boiler and they might have to move around to the other side of the boiler, so he would have to take [the scaffolding or staging] down and move [it] to the other side.... [Mr. Adams] would have to move [the scaffolding] after a pipecoverer was finished. As a matter of fact, a lot of times he would flip the boards over because it was so thick in there with dust and stuff from the pipecoverers and people working on the pipes, ... it would be so much, and my father, what he would do, he would turn these boards, like a couple times a day.... [T]here would be so much of this stuff in a room that they would have pans ... and they would fill up these pans constantly ... and you would have to take them out of the ship because it would be full of all of this material....

Harold Adams testified that he saw his father working around pipecoverers "every day." "Everyone that was in that room worked around them, because there was no getting away from it." He testified that when one handled the product "it would get all over you...."

Harold Adams testified that he met two of his father's friends, Cox and Oney, and he recalled that, "Both of them would work in the boiler rooms, or what you call the engine rooms of the ships. They would both be there working along[side] my father when I [saw] them."

### Clayton Cox Testimony

Mr. Clayton Cox's deposition was read into evidence. He worked at Sparrows from approximately 1940 until 1978 as a welder on the ships, usually in the engine rooms, boiler rooms, and pump rooms. In the same working area would be other trades, including asbestos workers and carpenters. All of these trades would be working side by side, "just like we are sitting here." He described how the asbestos workers worked in the same rooms and how these workers would, for example, cover a four-inch pipe with asbestos until it was "twenty-four to thirty inches." The asbestos, he testified, was "mostly all white." He testified as to the manufacturers of the asbestos

materials, "I am sure I can say Owens–Corning. I saw that." He also testified to a description of the dust:

> Well, if you was down in the engine room or boiler room and, say, we had been working for an hour or two hours, the general condition across—if you looked across, or if you looked somewhere where a little sunlight came down in, had a beam, you could see millions of particles.... And if you looked up at the skylight or whatever, say, from down the bottom of the engine room, it was like you were looking though a haze, or a heavy cloud or something.... [I]t [could] have been bright, but you were looking through so [much] haze and maze and dust particles in there that you could hardly pick out the skylight, which would be 90 feet over my head or better....

### Lawrence Oney Testimony

Lawrence Oney's deposition was also read into evidence. He testified that he worked between Key Highway and Sparrows Point Shipyards in the 1950s. From 1957 until 1987 he worked at Sparrows exclusively. He stated that he was a "[c]hipper, caulker and tank tester." He worked all over the ship and recalled working around pipecoverers, boiler coverers, and tank coverers. These other trades used asbestos products, and one of the products he remembered was the Kaylo brand. He knew the different brand names because he had "seen [the names] on the packages that the pipecovering came in." He testified that the color of the pipecovering and the block was "[p]retty close to white." He further testified that he first recalled seeing the Kaylo pipe insulation in 1957 and it was used often or "[a] lot." He recalled the last year he saw the Kaylo pipecovering to be approximately 1970 or 1980.

### DISCUSSION OF ADAMS ISSUE

 As we said previously, we conclude that Adams presented sufficient evidence to meet the "proximity, frequency, and regularity" test with respect to inhalation of OC's product, Kaylo. Bill Adams, a carpenter, constructed scaffolding for

workmen in other trades to use when working with construction and covering of the pipes in the engine and boiler rooms. Disney testified that Kaylo, the brand name of an asbestos product made by OC, was present on the ships in the engine rooms for pipecovering, and Oney said that Kaylo was used "[a] lot." Disney saw Bill Adams "quite often" in the engine room. Harold Adams said that he saw his father "every day on the ship" in the engine or boiler room, and that Adams generally had white dust all over his clothing and in his hair. Both Harold Adams and Disney said the white dust was generated by the asbestos pipecovering. According to Disney, the Kaylo product was white in color. Among the asbestos products present at the shipyard, he saw "Armstrong and Owens" products the most often.

Exposure to asbestos may be established circumstantially. *See Balbos,* 326 Md. at 210, 604 A.2d 445. "The evidence, circumstantial as it may be, need only establish that [Adams] was in the same vicinity as witnesses who can identify the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled." *Grimshaw,* 115 Md. App. at 185, 692 A.2d 5 (quoting *Roehling v. National Gypsum Co. Gold Bond Bldg. Prod.,* 786 F.2d 1225, 1228 (4th Cir.1986)). The evidence in this case is considerably more specific and extensive than that found sufficient in *ACandS v. Godwin,* 340 Md. 334, 667 A.2d 116 (1995). There, the Court of Appeals summarized the evidence with respect to the exposure of plaintiff Russell, a pipefitter who worked for a number of different contractors, to asbestos manufactured by Pittsburgh Corning Corporation:

> Thus, the evidence places Russell at [Sparrows Point] doing pipe covering work for twelve to fourteen months while Unibestos was available to Bethlehem pipe coverers. Further, pipe coverers employed by Bethlehem were 'always' around when Russell was working for a contractor. The jury could conclude from Webb's testimony that Bethlehem pipe coverers regularly used Unibestos interchangeably with the products of other manufacturers. Pipe coverers work in proximity to pipefitters. There was sufficient

evidence of substantial causation to take the case to the jury on behalf of Russell against [Pittsburgh Corning Corporation].

*Id.* at 355, 667 A.2d 116. In applying the proximity, frequency, and regularity test according to the standards utilized in *Balbos, Godwin,* and *Owens–Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 528–29, 682 A.2d 1143 (1996), we believe there was sufficient evidence from which a jury could infer that OC's Kaylo product was a substantial contributing cause of Adams's disease.

## CONCLUSION

We hold that the burden of proof to establish that the statutory cap is inapplicable rests with the plaintiff, and that the Walatka appellees failed to meet the burden in this case. We hold that the statutory cap does not violate Article 8 of the Maryland Declaration of Rights. Accordingly, we reverse the judgment of the trial court refusing to apply the cap and remand to the Circuit Court for Baltimore City, directing it to apply the statutory cap to all claims in the Walatka case. We affirm the judgments in the Adams case.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR THE ENTRY OF JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID SEVENTY–FIVE PERCENT BY APPELLEES WALATKA AND TWENTY–FIVE PERCENT BY APPELLANT OC.**